# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**OPTOWAVE CO., LTD,**

**Plaintiff,**

**-vs-**                                              **Case No.  6:05-cv-1083-Orl-22DAB**

**DMITRI G. NIKITIN, an individual, d/b/a
PRECISION TECHNOLOGY GROUP,**

**Defendant.**

_____

## ORDER

This cause came on for consideration with hearing on the following motion filed herein:

| | |
|---|---|
| **MOTION:** | **PLAINTIFF'S SUPPLEMENTAL MOTION TO COMPEL DISCOVERY [AS TO SPOLIATION AND SANCTIONS] (Doc. No. 42-1)** |
| **FILED:** | **July 2, 2006** |

**THEREON** it is **ORDERED** that the motion is **GRANTED** as set forth herein.

Plaintiff Optowave Co., Ltd. ("Optowave") sued Defendant Dmitri Nikitin d/b/a Precision Technology Group ("PTG") for breach of contract arising out of a dispute over the sale of equipment used to manufacture infrared glass filters.  The parties contracted for the sale of a scribing machine and a breaking machine that Optowave planned to use in manufacturing infrared glass filters to be used in cell phone cameras produced by manufacturers such as Samsung, Optowave's principal customer.  Optowave contends that as part of its contract with PTG for machines, the parties expressly incorporated into the contract narrow tolerance specifications and testing, which the machines never

passed.  PTG contends, among other defenses, that Optowave accepted the machines as fully functional and capable of performing according to contract specifications and then failed to pay the balance due on the contract.

In the course of discovery, Plaintiff sought to compel written discovery, particularly electronic documents and emails regarding the Contract, in addition to interrogatory responses, from Defendant Nikitin.  Following oral argument, and an agreement for Nikitin to produce most of the documents sought by Plaintiff, the Court set for hearing the issue of spoliation of certain internal emails between Nikitin and his employees, and the matter came on for hearing on August 1, 2006. *See* Doc. Nos. 51 (reserving issue of spoliation), 68; *see also* Doc. No. 54 (Nikitin's Response to Supplemental Motion to Compel Discovery[1]).  The evidence shows that despite written warnings not to destroy relevant evidence, Nikitin allowed crucial electronic evidence to be destroyed and, thus, has failed to produce it.  Upon consideration of the parties' filings and the evidence presented at the hearing, the Court finds that Nikitin was responsible for the spoliation of emails which would have shown Optowave's proposed specifications were incorporated in the contract; thus, Nikitin will not be allowed to contest that issue.

Optowave contends that the Contract incorporated eight certain specifications into the Contract, and that PTG failed to meet any of the specifications, thereby breaching the Contract.  As discussed below, the Court finds that Nikitin intentionally allowed the destruction of PTG's missing customer file and emails concerning incorporation of the specifications into the Contract and Optowave is entitled to an adverse inference instruction on the issue.

---

[1]Nikitin's Response is structured like an answer to a complaint, with "admit" or "deny" to numbered paragraphs. Doc. No. 45.

-2-

## FACTUAL BACKGROUND[2]

Plaintiff Optowave, a Korean company, is a high-tech startup venture specializing in thin film optic technology whose principal business is the manufacture and sale of sophisticated high quality infrared filters, with commercial applications for consumer microelectronics products such as cell phone digital cameras. *See* Doc. No. 69[3], Choi Aff. ¶¶ 2, 3.  Optowave's filters must be cut to tight tolerances in order to function effectively in microelectronic devices. Doc. No. 69, Choi Aff. ¶¶5, 29.

Precision Technology Group ("PTG")[4] is a manufacturer and supplier of the Zero Width Laser Cutting Technology ("ZWLCT") systems that avoid micro cracks and chipping, leaving no residual glass particles that can damage the insides of microelectronic devices.  Doc. No. 69, Choi Aff. ¶6, Doc. No. 55-2 at 16-21, PTG Proposal #071404; Defendant's Answer to Complaint ¶19.

In July 2004, two Optowave engineers met with Nikitin and other PTG employees, including Stefan Tudor, Vice President of Sales and Marketing[5] for international sales, to discuss and evaluate the suitability of PTG's laser scribing and breaking devices for Optowave's production needs. See Doc. No. 57-2, Tudor Dep. at 15-16; Doc. No. 59-3, Nikitin Dep. at 233-34.  Tudor was Optowave's primary contact at PTG, and he conducted all contract negotiations with Optowave after Optowave's engineers left Florida.  *See* Doc. No. 57-2, Tudor Dep. at 15-17; Doc. No. 59-2, Nikitin Dep. at 148.

On August 5, 2004, Optowave entered into a contract with PTG for the purchase of a laser

---

[2]Facts are either undisputed or based on testimony given at the hearing on August 1, 2006.

[3]An original signed copy of Mr. Choi's notarized affidavit dated July 28, 2006 was filed, following the filing of a faxed copy on July 28, 2006.  *See* Doc. Nos. 56-2, 69.

[4]Optowave sued Nikitin d/b/a Precision Technology Group ("PTG").  Doc. No. 1.  The issue of whether Optowave has sued PTG in the correct entity form is raised by Nikitin on summary judgment and will be addressed in that ruling.

[5]Nikitin assigned Stefan Tudor the principal responsibility for the sales relationship with Optowave.  Tudor had the direct authority to handle the Optowave account as he deemed appropriate. *See* Nikitin Depo. at 226.

scribing and breaking system, consisting of two separate machines, a glass scribing system and an automatic breaking system (the "Contract")[6]. *See* Doc. No. 55-2 & 65-2 (Contract No. 101072204P). Under the Contract, PTG was required to deliver a System consisting of two separate pieces of equipment: (1) a used SBM 777 FPD Glass Scriber (ZWCT) (the "Scribing Machine"); and (2) a new ABM 777 FPD Automatic Breaker (the "Breaking Machine"). *See* Doc. No. 55-2 & 65-2 § 1.0; Doc. No. 59-2, Nikitin Dep. at 88-89; Doc. No. 69, Choi Aff. ¶16; Doc. No. 75 at 3.

Tudor provided the original draft of the contract, which was based on a prior PTG contract that was modified by him to reflect Optowave's particular circumstances. *See* Doc. No. 57-2, Tudor Dep. at 16-17; Doc. No. 69, Choi Aff. ¶13. Tudor discussed the technical specifications (the "contract specifications") for Optowave's product with Nikitin, who advised that they could be met. *See* Doc. No. 57-2, Tudor Dep. at 26. Nikitin relied on Tudor to conduct the contract negotiations, and Nikitin reviewed the Contract when Tudor showed it to him. Doc. No. 59-2, Nikitin Dep. at 148; Doc. No. 57-2, Tudor Dep. at 16-17.

The total purchase price of the Contract was $250,000. *See* Doc. No. 55-2 & 65-2, Contract § 1.0. Section 5.2 of the Contract specified that 90% of the total amount would be payable on notification that the shipment as specified in Paragraph 1.1 and Initial Acceptance Test (IAT) had been completed. Doc. No. 55-2 & 65-2, Contract § 5.2. The remaining 10% would be payable on successful completion of Final Acceptance Test (FAT) in Korea. "IAT and FAT forms are in attachment to the present contract and have been agreed upon by the Buyer and the Seller." Doc. No. 55-2 & 65-2, Contract § 5.2. The IAT and FAT forms listed specifications for eight different

---

[6]During the period of contract negotiation and formation, Optowave was unrepresented by legal counsel and lacked any personnel with fluency in the English language. *See* Doc. No. 69, ¶14.

categories: (1) average edge roughness; (2) repeatability; (3) scribe & breaking chipping; (4) chipping after breaking; (5) linearity after breaking; (6) lateral perpendicularity after breaking; (7) cross-sectional perpendicularity after breaking; and (8) size tolerance. See Doc. Nos. 55-2 & 65-2 at 10-15; Doc. No. 57-2, Tudor Dep. at 26-27, 29-30; Doc. No. 69, Choi Aff. ¶¶15, 18. Section 6.2 of the Contract stated: "For the inspected goods, the Buyer shall issue a written certificate in the form of Attachment to that effect ("Inspection Certificate") and such issuance shall constitute the Buyer's binding acceptance of the goods so inspected." Doc. Nos. 55-2 & 65-2 at 4. Nikitin was fully aware that the requirements were being incorporated into the Contract, having signed the Contract and initialed every page. Doc. No. 57-2, Tudor Dep. at 27, 87-88.

The Contract also contains a provision that Defendant would at its own expense repair, replace or refund the cost of the System should it fail to perform up to specifications and PTG would bear the expense of returning any defective goods. *See* Doc. No. 55-2 & 65-2, Contract, Section 3.2. *See* Doc. Nos. 55-2 & 65-2, Contract § 3.3. The Contract also includes a 24-month warranty which states:

> WARRANTY
> The UNIT(s) shall be warranted for a period of twenty four (24) months, from the date of certification, to be free from defects in materials and workmanship. P.T.G. will replace or repair, at its option, any component found to be defective, in normal service during that period. Purchased components, software and specific devices carry their own warranties from their respective manufacturers and P.T.G. assumes no liability or responsibility for those items. Further, P.T.G. does not warranty rubber or plastic parts, consumables or cutting tools. Should safety seals on the UNIT(s) be broken or tampered with, the warranty will be null and void.

*See* Doc. Nos. 55-2 & 65-2 at 7 (Attachment "Standard Terms and Conditions," WARRANTY Section); Doc. No. 57-2, Tudor Dep. at 87-88. Optowave agreed to obtain an irrevocable Letter of Credit ("LOC") to assure payment to PTG for the System. *See* Doc. No. 55-2 & 65-2, Contract, § 5.2 and "Instructions to Buyer for Letter of Credit Issuance."

The latest shipping date for the System was agreed to be September 29, 2004. *See* Doc. No. 55-2 & 65-2, Contract, § 2.4 & "Instructions to Buyer for Letter of Credit Issuance"; Doc. No. 57-2, Tudor Dep. at 34; Doc. No. 69, Choi Aff. ¶20. The Contract also contained a penalty provision for late delivery, assessing 0.3% of the total contract price for each day late, subject to a maximum penalty of 10%. *See* Doc. No. 55-2 & 65-2, Contract, § 8.0.

On September 27, 2006, Tudor sent an email to an Optowave engineer stating:

> I am afraid I don't have good news. Some of [PTG's] vendors informed us today that there will be a delay on the delivery of our parts. This situation is really exceptional – our city was hit by 4 hurricanes in 6 weeks and there is a lot of destruction all around. We do not have power in our factory this morning, the same as all other businesses in our neighborhood. We will do our best in this situation, but I thought you need to know about this.

Doc. No. 65-2 at 34.

 Optowave's engineer Jinyoung Kim arrived at Defendant's facility in Florida on or around October 5, 2004 and was forced to wait for approximately two weeks while PTG continued to work on the System. *See* Doc. No. 70[7], Kim Aff., ¶ 16-18; *See* Doc. No. 57-2, Tudor Dep. 51-52; *See* Doc. No. 59-3, Nikitin Dep. at 365-66. The production and assembly of the Scribing Machine and Breaking Machine was completed on October 18, 2004. *See* Defendant's Answer to Request for Admissions No. 34; Doc. No. 69, Choi Aff. ¶33. Initial Acceptance Testing was conducted at PTG's facility in Lake Mary, Florida, on or about October 18-19, 2004. *See* Kim Affidavit, ¶¶19, 20; *See* Doc. No. 57-2, Tudor Dep. at 42-44.

Several aspects of the System's functionality were still incomplete, and the System did not pass the Initial Acceptance Test (IAT) in Florida. *See* Kim Affidavit, ¶¶19, 20; Doc. No. 57-2, Tudor

---

[7]An original signed copy of Mr. Kim's notarized affidavit dated July 31, 2006 was filed, following the filing of a faxed unsigned copy on July 28, 2006. *See* Doc. Nos. 56-2, 70.

Depo. at 45; *See* Doc. No. 65-7, Letter from Nikitin dated 10/20/04.  Following discussions between

the parties, they agreed to ship the System to Korea and perform the final breaking system alignment

and adjustments at Optowave's facility; the agreement was memorialized in a letter from Nikitin to

Choi dated October 20, 2004, which stated:

> Currently, additional time is required to complete several aspects of the systems functionality, including refinement of the breaking parameters, file exchange protocol, staging table, alignment, and additional frame holding assemblies.
>
> As agreed upon, PTG will ship the system now, and perform the final breaking system alignment and adjustments in the actual production environment in Optowave's facility (IAT was not performed at PTG).
>
> PTG engineers, together with engineers from Optowave, will provide the additional support (outside of the originally contracted support) to do everything necessary to bring system performance to the level described in the system specifications, including the full replacement of the breaking unit.

*See* Doc. No. 65-7, October 20, 2004 Letter from Nikitin.  Optowave understood that such additional

engineering support was to be provided at no extra charge. *See* Doc. No. 69, Choi Aff. ¶32; *see* Tudor

Depo. at 48-49 (additional engineering support provided to Optowave at no extra charge).

Optowave was already badly behind schedule in preparing for a critical sales presentation to

Samsung Electronics due to the delayed delivery of the System; therefore, Optowave agreed to have

the System shipped to Korea to be tested in Optowave's actual production environment, subject to the

statements in Nikitin's October 20, 2004 Letter. *See* Doc. No. 69, Choi Aff. ¶30.  As a condition of

delivery, Defendant required and Optowave agreed to release the initial 90% payment ($225,000)

under the Line of Credit, subject to Nikitin's statements in the October 20, 2004 Letter. *See* Doc. No.

69, Choi Aff. ¶31.

On October 25, 2004, PTG dispatched a field engineer named Eugene Kayzerman to perform

the installation of the System at Optowave's facility in Korea, as well as to assist in the final

acceptance testing and train Optowave's engineers. *See* Doc. No. 58-3, Kayzerman Dep. at 153; Doc.

No. 69, Choi Aff. ¶35; Doc. No. 70, Kim Affidavit, ¶25.  It is undisputed that Kayzerman and

Optowave engineers worked for three weeks on the System, until Kayzerman left Korea on November

13, 2004.  *See* Doc. No. 63 at 2; Doc. No. 57-2, Tudor Dep. at 53; Doc. No. 58-2 & 58-3, Kayzerman

Dep. at 126, 249-50; Doc. No. 59-4, Field Service Report; Doc. No. 69, Choi Aff. ¶37.   It is

undisputed that the specifications on the test form were not met while Kayzerman was in Korea.  *See*

Doc. No. 70*,* Kim Aff. ¶30; Doc. No. 57-2, Tudor Dep. at 53; Doc. No. 58-2, Kayzerman Dep. at 126.

However, Kayzerman believed that in the future the System was capable of performing the

specifications.  Doc. No. 58-2, Kayzerman Dep. at 126.  On November 13, 2004, the parties signed

a Field Service Report.  Doc. No. 65-2 at 35-36.  The Field Service Report states in pertinent part:

> **Initial installation and alignment.**
>            Equipment has arrived without visual damage and moved to clean room.  After
> connection to electricity, cooling water supply, and air machines were turned on, all
> initial test [sic] were successful.  both SBM 777 and ABM 777 were fully functional.
> Next day, during the attempt to start SBM 777 computer failed.
> After contacting PTG we received ghost copy of the hard drive and recovered system.
> In next two days have been done laser and systems alignment, initial linear scribing,
> and circular cutting.  After that we start to prepare to cut wafers and scribe them.
> During that time there were some problems with laser performance:
>              - misalignment of beam angle (beam angle has been realigned)
>              - adjustment of cut initiation tool (height, air pressure)
>              - Air-Water Jet alignment (direction of Jet, X and Y coordinates, water
>                current)
> They were reason for missing scribes and circular miscutting.  Those particular
> subjects have to be checked on regular basis which is described in SBM 777 manual
> Maintenance Chart.
>
> **Getting work conditions and performance**
> Laser to breaker alignment includes calculations of first break offset, align position,
> fixture correction degree those factors are very important to breaker performance.
> After the personnel have got some initial training on machines operations I was just
> assisting in their process with machines operation.  To achieve the best performance
> of systems we tried different kind of base material, time of contact, air pressure. (All
> results of numerical value and pictures are at Optowave Co.)  In general we went from

> more than 200 micron to less than 30 micron on first break direction (90 degree).  For
> second direction (0 degree) is around 90 micron.
> My opinion:
>> - equipment are fully functional
>> - It's capable of performing specifications needs;
>> - Needs a lot more time than we had to meet those specifications.

/S/Kim Jinyoung and /S/Eugene Kayzerman.

Doc. No. 65-2 at 35-36.  Kayzerman told Optowave that upon returning to Florida he would work

with PTG's engineers to find a solution to Optowave's problems with the System.  *See* Doc. No. 58,

Kayzerman Dep. at 213-15.  It is undisputed that after Kayzerman returned to Florida, PTG sent no

other personnel for on-site assistance to Optowave.  *See* Doc. No. 69, Choi Aff. ¶¶39-41.

On November 17, 2004, Robert Choo, Esq., Plaintiff's counsel, wrote to PTG complaining of

the delay in the delivery of the system and its substandard performance and advising that Optowave

was withholding the remaining $25,000 until the system passed the Final Acceptance Test.  Pl. Ex.

2.[8]  On November 22, 2004, Optowave timely submitted a warranty claim to Defendant pursuant to

the warranty provisions of the Contract.  *See* Pl. Ex. 4.  On November 22, 2004, PTG wrote to Mr.

Choi at Optowave:

> After our field service engineer returned from Korea, we reviewed his field service
> report for information critical to understanding the situation.

1.  Based on evaluation of his trip report we believe that our equipment is in full compliance with
paragraph #3. . . When operated by a trained operator, our equipment performs according to
specifications in Paragraph 1, Item 1 and 2.  We also believe that that [sic] the performance expected
by Optowave should be achieved by "fine tuning their manufacturing process/technology.

> 2.  Through our field service engineer, we have suggested to Optowave ways to check
> and verify several key parameters critical to the overall success of their
> process/technology.  These suggestions were intended to help Optowave fine-tune
> their manufacturing process.  We understand that these recommendations were not
> carried out. . . .

---

[8]References are to the exhibits presented at the Evidentiary Hearing of August 1, 2006.

3.  As requested by Optowave, we shipped the system to Korea without providing training at our factory for two Optowave engineers, as specified in Paragraph 11 Training of our Contract.  We understand that the only way to achieve optimum system performance is to have trained and certified equipment operators.  We are willing to schedule a formal training session at our facility in Lake Mary, Florida, as soon as the required equipment is available.

We sent one of our service engineers to Optowave's facility in Korea to provide system installation assistance and operator training.  Recently we have been contacted by Optowave personnel that are trying to operate the system, but have not taken part in the training session in Korea.  It is very difficult to guide untrained operators through the phone and this situations can create severe damage to the system.

At Optowave's request, we are willing to send an equipment service engineer back to Korea to provide additional on-site operator training, based on a purchase order for additional field service support. . . . Please facilitate the payment for the attached Service Invoice for Installation and Training provided in Korea by our service engineer from October 23 to November 14, 2004.

Doc. No. 65-5 at 29-30.  Defendant provided no repair services or replacement of the System under the warranty provisions. *See* Doc. No. 69, Choi Aff. ¶41.

PTG has never furnished a replacement for the Breaking Machine or Scribing Machine to Optowave or refunded the $225,000 paid by Optowave from the Line of Credit disbursement.  *See* Doc. No. 69, Choi Aff. ¶¶ 41, 43, 46.  On November 18, 2004, PTG billed Optowave $68,441.28 for engineering services, which remains unpaid.  Doc. No. 65-5 at 38.

Although Optowave advised Defendant on several occasions in February and March 2005 of its intention to return the Breaking Machine to Florida, PTG never responded to Optowave's emails. *See* Doc. No. 69, Choi Aff. ¶46.  On or about March 9, 2005, the Breaking Machine was air-freighted by Optowave from Korea to Orlando and was eventually returned back to Optowave in Korea. *See* Doc. No. 69, Choi Aff. ¶47.  On May 9, 2005, counsel for Optowave sent a demand letter to PTG which included a notice regarding the non-destruction of computer files, warning that PTG could be liable for spoliation of evidence and subject to sanctions for deleting or altering files.  Pl. Ex. 5.

Sometime in Spring 2005, Tudor was terminated from PTG. Doc. No. 59-3, Nikitin[9] Dep. at 188, 193. All email communications between Optowave and PTG were exclusively through Tudor. Doc. No. 59-3, Nikitin Dep. at 189-90. At PTG, emails were preserved – versus being wiped out when the hard drive was reformatted – in a backup copy of the PST file, which is an offline Microsoft Outlook file where emails are stored. Doc. No. 59-3, Nikitin Dep. at 191. PTG did not make a backup copy of Tudor's offline Outlook (PST) file. Doc. No. 59-3, Nikitin Dep. at 192, 207.

In April 2006, a computer hacker hacked into PTG's computer system and "all emails were wiped" and PTG was not able to recover all of the data. Doc. No. 59-2, Nikitin Dep. at 135. The computer hacking was reported to the police. Doc. No. 59-2, Nikitin Dep. at 136.

### SPOLIATION OF EVIDENCE

Optowave alleges that Nikitin intentionally allowed the destruction of internal emails, particularly those from former PTG employee Stefan Tudor, which would have supported Optowave's position that the Contract was drafted by PTG and incorporated Optowave's acceptance test specifications into the contract specifications. Nikitin does not seriously contest that he failed to preserve Tudor's emails following his termination. Instead, Nikitin argues that Stefan Tudor is a disgruntled former employee whose testimony is biased against PTG.

"Spoliation" is the "intentional destruction, mutilation, alteration, or concealment of evidence." BLACKS LAW DICTIONARY 1437 (8th Ed. 2004). Federal law, not state law, controls the imposition of sanctions for failure to preserve evidence in a diversity case. *See Flury v. Daimler Chrysler Corp.*, 427 F.3d 939 (11th Cir. 2005) (federal law governs the imposition of spoliation sanctions), *cert. denied*, 126 S. Ct. 2967 (2006); *see also King v. Illinois Central R.R. Co.* 337 F.3d

---

[9]Nikitin was deposed on June 9, 2006, June 22, 2006, and again on August 2, 2006. *See* Doc. 59-2, 59-3, 80-2.

550, 556 (5th Cir. 2003) (same); *Assimack v. J.C. Penney Corp.*, 2005 WL 2219422, *2 (M.D. Fla..

2005) (same)  The Court has broad discretion to impose sanctions derived from its inherent power

to manage its own affairs and to achieve the orderly and expeditious disposition of cases.  *Id.* at 944

(citing *Chambers,* 501 U.S. at 43).  Sanctions for discovery abuses are intended to prevent unfair

prejudice to litigants and to insure the integrity of the discovery process.  *Id.*  The courts have the

inherent power to enter a default judgment as punishment for a defendant's destruction of documents:

> Sanctions may be imposed against a litigant who is on notice that documents and
> information in its possession are relevant to litigation, or potential litigation, or are
> reasonably calculated to lead to the discovery of admissible evidence, and destroys
> such documents and information. While a litigant is under no duty to keep or retain
> every document in its possession once a complaint is filed, it is under a duty to
> preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated
> to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery,
> and/or is the subject of a pending discovery request.

*Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 126 (S.D. Fla. 1987) (quoting *Wm. T.*

*Thompson v. General Nutrition,* 593 F.Supp. 1443, 1455 (C.D. Cal. 1984)).

Federal Rule of Civil Procedure 37 also authorizes a panoply of sanctions for a party's failure

to comply with the rules of discovery.  Subsection (d) provides that where a party fails to "serve a

written response to a request for inspection submitted under Rule 34, after proper service of the

request," the court may enter "such orders in regard to the failure as are just," including those actions

authorized by Rule 37(b)(2)(A), (B) and (C), which provide the following remedies: (A) An order that

the matters regarding which the order was made or any other designated facts shall be taken to be

established for the purposes of the action in accordance with the claim of the party obtaining the

order; (B) An order refusing to allow the disobedient party to support or oppose designated claims

or defenses, or prohibiting him from introducing designated matters in evidence; (C) An order

striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or

dismissing the action of proceeding or any part thereof, or rendering a judgment by default against the disobedient party.  Although Rule 37(b) applies when a party fails to comply with a court order, Rule 37(d)'s requirement that a party participate in discovery that is not regulated by the court expressly adopts most of the sanctions in Rule 37(b)(2), including the power to grant a default judgment. *See Telectron,* 116 F.R.D. at 128-29 n. 8.

Although federal law controls spoliation sanctions, the Court's opinion may be "informed" by state law, as long as it is consistent with federal law, because federal law in the Eleventh Circuit does not set forth specific guidelines on spoliation.  *Flury*, 427 F.3d at 944.  Under Florida law, the remedy for a party failing to produce crucial but unfavorable evidence that is destroyed or inexplicably disappears is an adverse inference or discovery sanctions.  *Martino v. Wal-Mart Stores, Inc.*, 908 So.2d 342 (Fla. 2005).  Prior to the court exercising any leveling mechanism due to spoliation of evidence, the court must decide:  1) whether the evidence existed at one time, 2) whether the spoliator had a duty to preserve the evidence, and 3) whether the evidence was critical to an opposing party being able to prove its *prima facie* case or a defense.  *Golden Yachts, Inc. v. Hall*, 920 So.2d 777, 781 (Fla. 4th DCA 2006); *see Flury*, 427 F.3d at 944 (applying Georgia spoliation[10] and sanctions law).        In addition to the factors applied by Florida courts, under federal law in the Eleventh Circuit, the most severe sanction of default, for instance, should be exercised only when there is a showing of bad faith and lesser sanctions will not suffice.  *See Flury*, 427 F.3d at 944-45; *see also Aldrich v. Roche Biomedical Laboratories*, 737 So.2d 1124, 1125 (Fla. 5th DCA 1999) (the appropriate sanction when a party fails to preserve evidence in its custody depends on the willfulness

---

[10]Under Georgia law, to determine whether dismissal for spoliation is warranted, the court must consider: (1) whether the defendant was prejudiced as a result of the destruction of evidence; (2) whether the prejudice could be cured; (3) the practical importance of the evidence; (4) whether the plaintiff acted in good or bad faith; and (5) the potential for abuse if expert testimony about the evidence was not excluded.  *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 945 (11th Cir. 2005) (citing Chapman v. Auto Owners Ins. Co., 469 S.E.2d 783, 784 (Ga. 1996)).

or bad faith of the party responsible), *rev. denied*, 751 So.2d 1250 (Fla. 2000). An adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith; thus, negligence in losing or destroying records is not enough for an adverse inference, as "'it does not sustain an inference of consciousness of a weak case.'" *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) (quoting *Vick v. Texas Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975)). The Court should not infer that the missing evidence was unfavorable unless the circumstances surrounding the evidence's absence indicate bad faith. *Id*.

### Evidence Existed

Tudor testified that he communicated regularly by email with Nikitin and other PTG employees during his employment at PTG. Doc. No. 57-2, Tudor Dep. at 32. On June 12, 2006, eleven days before the discovery cutoff, Nikitin produced a small number of Tudor's emails; Optowave subsequently requested a complete copy of all of Tudor's e-mails. After the July 20, 2006 hearing on Optowave's Motion to Compel (*see* Doc. No. 51), Nikitin agreed to produce, and the Court ordered production of, the full copy of Tudor's Outlook file and a CD-ROM containing the original PST file. However, the PST file of Tudor's Optowave-related emails Nikitin produced on July 28, 2006 did not contain all of the Optowave emails. Instead of the PST file, Nikitin produced only hard copies of 20 emails. During the August 1, 2006 hearing, Nikitin testified that he had over 5GB of data contained in the PST file; at the conclusion of the evidentiary hearing on August 1, 2006, the Court ordered Nikitin to produce his entire Outlook file (including archived material) on an external drive.[11]

---

[11]Optowave contends that instead of 5GB, what Optowave received from Nikitin was a single PST file about 1.4GB in size, with no archived emails and the new production only yielded seven (7) additional emails related to Optowave. *See* Doc. Nos. 71 at 5; 71-2. Nikitin responds that the reduced size is because the file is compressed but does not dispute that it yielded only seven additional emails. The Court need not decide this issue, given the other findings of spoliation.

Tudor testified under oath (by telephone) at the August 1, 2006 hearing that he did not delete any emails or other documents as a normal business practice and that Nikitin was diligent in keeping and preserving electronic documents. Tudor further testified that Nikitin insisted that he keep electronic customer files on his computer for all of his customers, including Optowave, which were saved in a Word documents, including his notes of telephone conversations with Optowave employees, and the original draft of the contract that he used as the basis for the Contract.

Of the electronic documents produced as part of Tudor's PST file, all "sent" emails were dated after October 4, 2004, two full months after the negotiation of the terms of the Contract. Optowave's computer and email administrator expert, Michael Snetzko, testified at the hearing that the PST file created by PTG demonstrated that 80 messages were in the inbox, and 33 messages were in the "sent" folder. *See* Pl. Ex. 8, 8A, 8B, 11. However, the PST file indicated certain messages had been intentionally deleted, where the "inbox" folder indicated that a reply had been sent to an incoming message, but no such outgoing message existed in the "sent" folder. Snetzko further testified that to delete a "sent" message from the folder would be a deliberate act and could not be the result of an accidental deletion. In addition, Optowave produced evidence at the hearing of other emails it possesses from Tudor that were not contained in the PST file produced by Nikitin. *See* Pl. Ex 9. Officer Parcell investigating PTG's hacking report testified that PTG had capacity for 250 gigabytes and had the past ten years on the hard drive. Nikitin's testimony that he could not remember removing hard drives is not credible.

Based on the evidence introduced at the hearing, there are only two explanations why the missing Tudor emails were not produced, and both explanations point to Nikitin's intentional conduct. The Court finds that either the Tudor emails were selectively deleted or they were lost when

Nikitin hired the computer consultant to reformat PTG's server after Tudor left the company on April 27, 2005, and after Nikitin had been placed on notice that Optowave would be asserting claims against PTG.

**Duty to preserve**

Defendant was first notified on November 17, 2004 by Plaintiff's counsel, Robert Choo, Esq., of possible litigation arising out of the allegedly faulty equipment purchased by Optowave from PTG. Pl. Ex. 2.[12]   Optowave invoked ¶ 9 of the Contract, on the grounds that delivery of the system was unreasonably delayed, performance of the system did not conform to the quality specifications in the contract.  *Id.*  Optowave served PTG with a formal claim dated November 22, 2004. Pl. Ex. 4. Optowave subsequently retained Orlando counsel, Carolyn Salzman, Esq., who on May 9, 2005, sent an explicit demand letter to Nikitin, making it abundantly clear that "legal action" was anticipated. Pl. Ex. 5.  Either letter was sufficient to put Nikitin on notice that legal action would be taken if an amicable agreement could not be reached.  In addition, Nikitin/PTG's duty to preserve all relevant materials (or those materials that could lead to other relevant materials) was triggered directly when PTG was put "on notice that it has a legal duty to preserve all evidence as further set forth in the attached NOTICE REGARDING NON-DESTRUCTION OF COMPUTER FILES." Pl. Ex. 5 (the "Non-Destruction Notice").  The Non-Destruction Notice spelled out that PTG could be liable for spoliation of evidence and subject to sanctions for deleting or altering files by storing newly created files to existing drives, loading new software, using utility programs to permanently wipe files, disks or drives, or disposing of media storage devices replaced to upgrades.  *Id*.  The Non-Destruction Notice suggested that PTG could comply by immediately making a copy of the hard drives on all

---

[12]References are to the exhibits presented at the Evidentiary Hearing of August 1, 2006.

network servers, computers, and/or laptop computers, including any deleted files resident on the hard drives.  *Id.*  PTG did not make a backup copy of Tudor's offline Outlook (PST) file because "there was no really reason for that."  Doc. No. 59-3, Nikitin Dep. at 192.  PTG contends that Nikitin "has produced numerous emails" and that Nikitin saved Tudor's file on May 5, 2005 before the [Carolyn Salzman] letter of May 9, 2005," which after Nikitin's testimony at the hearing, the Court finds too coincidental and highly dubious.  Doc. No. 75 at 5.

Nikitin is highly competent in advanced computer technology, as evinced by his ability to build, from scratch, his own computer with multiple drives.  *See* Doc. 80-2, Nikitin Dep. at 517 (admitting to constructing his own computer with three separate drives over 60 gigs).  Almost five months after being put on notice as to possible litigation in November 2004 and May 2005, Defendant allowed another party to reformat the hard drives of his employees' computers without first preserving relevant files contained on the computers to be reformatted.  These included the computer used by Tudor, according to Nikitin, the employee who dealt exclusively[13] with Optowave and who was terminated prior to the reformatting of the hard drive.  Due to the reformatting of the employee hard drives, all information contained on those drives, including e-mails between Tudor and Optowave discussing various aspects of the Contract and the disputed specifications, as well as other internal company e-mails discussing the Optowave account, were erased.

Given Nikitin's level of sophistication in advanced computer technology, he must at least have been aware that reformatting the hard drives of his employees' computers, would create a loss of all of the documents contained on the drive prior to its reformatting.  Despite this, the Defendant allowed the reformatting to take place without first preserving the information and documents already

---

[13]Optowave contends that there are other PTG employees with relevant knowledge, but Tudor was the primary sales contact.

contained on the computers after he had been put on notice of potential litigation and explicit notice of the duty to preserve the evidence.  The Court finds that Nikitin allowed relevant evidence to be destroyed in bad faith.  Destroying or allowing destruction of Tudor's customer file and emails was a blatant disregard for the liberal rules of discovery which undermines the integrity of the judicial process and warrants sanctions.  *See Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997); *Zubulake v. UBS Warburg LLC,* 229 F.R.D. 422, 430 (S.D. N.Y. 2004).

### Crucial to the case

The evidence that Optowave alleges is missing or destroyed in this case, Tudor's customer file and emails, are directly relevant to construction of the terms of the Contract.  Optowave contends that: 1) the parties understood that acceptance tests, or the contract specifications, were incorporated into the Contract, and 2) the Contract must be construed against PTG, who drafted the Contract.  PTG disputes that they drafted the Contract and whether the specifications were incorporated, as well as whether the system passed the specification testing.

Under Florida law, a document may be incorporated by reference in a contract if the contract specifically describes the document and expresses the parties' intent to be bound by its terms.  *Management Computer Controls, Inc. v. Charles Perry*, 743 So.2d 627, 631 (1st DCA 1999).  When the language used in a contract is ambiguous or unclear, under Florida law, a court may consider extrinsic evidence not to vary the terms of the contract, but to explain, clarify or elucidate the ambiguous language with reference to the subject matter of the contract, the circumstances surrounding its making, and the relation of the parties.  *United States o/b/o Small Business Administration v. South Atlantic Production Credit Assoc.*, 606 So.2d 691, 695 (Fla. 1st DCA 1992).  Extrinsic evidence is admissible only where the ambiguity is latent, *i.e.*, the writing on its face

-18-

appears clear and unambiguous, but there is some collateral or extrinsic matter which renders its application uncertain. *Id.* Alternatively, as a last resort, if the ambiguity cannot be resolved or the parties intent cannot be derived from extrinsic evidence, the ambiguous term is to be construed against the drafter because the party against whom it operates had the possibility of drafting the language so as to avoid the dispute. *Arriaga v. Florida Pacific Farms, LLC*, 305 F.3d 1228, 1248 (11th Cir. 2002) (citing *Farnsworth on Contracts* § 7.11 (1998)).

In § 5.2 of the Contract, incorporated by reference was that the initial 90% of the Contract price would be due on notifications that the shipment of all goods as specified in Paragraph 1.1 and [IAT] have "been completed." Doc. No. 55-2 & 65-2, Contract § 5.2. The final 10% would be payable on "successful completion" of Final Acceptance Test (FAT) in Korea. Doc. No. 55-2 & 65-2, Contract § 5.2. Section 5.2 also contained the clause: "IAT and FAT forms[14] are in attachment to the present contract and have been agreed upon by the Buyer and the Seller" (Doc. No. 55-2 & 65-2, Contract § 5.2); however, nowhere is the term "successful completion" or "completion" defined in the Contract. The court finds that Tudor's missing customer file and emails concerning negotiation of the Contract (particularly those sent before October 2004) are crucial to these fundamental contract construction issues under Florida law.

### Sanction imposed under the Court's inherent power[15]

Optowave seeks sanctions in the form of an order determining that Nikitin and PTG are prohibited from introducing any testimony that the machines complied with the terms and

---

[14]The IAT and FAT forms (identically) listed specifications for eight testing categories: (1) average edge roughness; (2) repeatability; (3) scribe & breaking chipping; (4) chipping after breaking; (5) linearity after breaking; (6) lateral perpendicularity after breaking; (7) cross-sectional perpendicularity after breaking; and (8) size tolerance. See Doc. Nos. 55-2 & 65-2 at 10-15. Some of the categories, but not all, list a "specification" figure, without elaboration.

[15]Under Federal Rule of Civil Procedure 37, the analysis is essentially the same as under the Court's inherent power, and the result would be the same.

specifications of the Contract as contended by them.  Doc. No. 42 at 10.  Optowave contends that such a ruling would effectively result in a finding of liability in favor of Optowave and against Nikitin.  "The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis." *Zubulake,* 229 F.R.D. at 430.

In *Telectron, Inc. v. Overhead Door Corp.,* 116 F.R.D. 107 (S.D. Fla.1987), involving a similar willful destruction of documents that were subject to discovery requests in a complex anti-trust case, the district court defaulted the defendant upon finding that corporate counsel for the defendant ordered the destruction of all the pricing documents he believed would be damaging to the corporate defendant.  Because of Seventh Amendment concerns and the public policy that cases should be decided upon consideration of the merits of the case, the court in *Telectron* held that default should be used only in "'flagrant cases' in which it is demonstrated that the failure to produce 'materially affect[s] the substantial rights of the adverse party' and is 'prejudicial to the presentation of his case.'" 116 F.R.D. at 129 (quoting *Wilson v. Volkswagen of America, Inc.,* 561 F.2d 494, 504 (4th Cir.1977) *cert. denied,* 434 U.S. 1020 (1978)); *Helmac Products Corp. v. Roth (Plastics) Corp.*, 814 F. Supp. 560, 572 (E.D. Mich. 1992) (defaulting the defendant who had destroyed documents intentionally to prevent fair adjudication of the dispute).

While the undermining of the judicial integrity of the court by intentionally destroying evidence could subject the guilty party to the most severe sanction available, a finding on liability in favor of the non-spoliating party, so severe a sanction is inappropriate in the instant action.  The Court finds that the appropriate sanction for Nikitin's spoliation is an adverse inference instruction to the jury directing that the destroyed evidence would have supported the Plaintiff's case on the following two issues:  1) the parties understood that acceptance tests, or the contract specifications, were

incorporated into the Contract, and 2) the Contract must be construed against PTG, who drafted the Contract.  The language of the adverse inference instruction must be left to the discretion of the District Judge to determine, depending on the issues remaining in the case at the time of trial.  This sanction will serve to cure the unacceptable actions of Nikitin, while allowing the case to be decided on the merits.

      **DONE** and **ORDERED** in Orlando, Florida on November 7, 2006.

*David A. Baker*
_____

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record