# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

OPTOWAVE CO., LTD,

          **Plaintiff,**

-vs-                                     **Case No.  6:05-cv-1083-Orl-22DAB**

DMITRI G. NIKITIN, an individual, d/b/a
PRECISION TECHNOLOGY GROUP,

          **Defendant.**

_____

## REPORT AND RECOMMENDATION AND ORDER

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without hearing on the following motions filed herein:

| | |
|---|---|
| **MOTION:** | **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. No. 55)** |
| **FILED:** | **July 28, 2006** |

**THEREON** it is **RECOMMENDED** that the motion be **DENIED** with findings.

| | |
|---|---|
| **MOTION:** | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 63)** |
| **FILED:** | **July 28, 2006** |

**THEREON** it is **RECOMMENDED** that the motion be **DENIED**.

| | |
|---|---|
| **MOTION:** | **PLAINTIFF'S MOTION FOR CLARIFICATION OF ORDER (Doc. No. 91)** |
| **FILED:** | **November 13, 2006** |

**THEREON** it is **ORDERED** that the motion is **GRANTED** in part as to the clarification that Optowave is entitled to the equivalent of the adverse inference as set forth in Doc. No. 90, which in the case of a bench trial, is a finding of fact by the Court. To the extent Optowave seeks its fees and costs for the Motion for Sanctions, the Motion is **DENIED** without prejudice to its reassertion at the close of the case.

Plaintiff Optowave Co., Ltd. ("Optowave") sued Defendant Dmitri Nikitin d/b/a Precision Technology Group ("PTG") for breach of contract arising out of a dispute over the sale of equipment used to manufacture infrared glass filters. The parties contracted for the sale of a scribing machine and a breaking machine that Optowave planned to use in manufacturing infrared glass filters to be used in cell phone cameras produced by manufacturers such as Samsung, Optowave's principal customer. The Court previously found appropriate an adverse inference against Nikitin that the parties expressly incorporated into the Contract narrow tolerance specifications and testing. *See* Doc. No. 90. This matter comes before the Court on referral of the parties' cross-motions for summary judgment. Doc. Nos. 55, 63. Optowave contends that it is entitled to partial summary judgment because the PTG machines failed to meet the Contract specifications and PTG has failed to repair, replace or refund the cost of the machines. Optowave also contends that it is entitled to summary judgment on PTG's countersuit.

Nikitin d/b/a PTG seeks summary judgment that Optowave has sued the wrong PTG entity, that Optowave accepted the machines as fully functional and capable of performing according to contract specifications, and that Optowave has failed to pay for the balance due on the contract and for additional engineering services rendered. Doc. No. 63.

### STANDARD FOR CROSS-MOTIONS FOR SUMMARY JUDGMENT

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." In *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986), the Supreme Court held that this burden could be met if the moving party demonstrates that there is "an absence of evidence to support the non-moving party's case." *Id.* at 325. At that point, the burden shifts to the non-moving party to go beyond the pleadings and present specific evidence giving rise to a triable issue. *Id.* at 324.

In reviewing a motion for summary judgment, the Court must construe the evidence and all inferences drawn from the evidence in the light most favorable to the non-moving party. *WSB-TV v. Lee,* 842 F.2d 1266, 1270 (11th Cir. 1988).  Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)(emphasis in original).

The Rule 56 standard is not affected by the filing of cross motions for summary judgment: "The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 at 335-36 (3d ed. 1998). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *See United States v. Oakley,* 744 F.2d 1553, 1555 (11th Cir. 1984).

### FACTUAL BACKGROUND[1]

Plaintiff Optowave, a Korean company, is a high-tech startup venture specializing in thin film optic technology whose principal business is the manufacture and sale of sophisticated high quality infrared filters, with commercial applications for consumer microelectronics products such as cell phone digital cameras. *See* Doc. No. 69[2], Choi Aff. ¶¶ 2, 3.  Optowave's filters must be cut to tight tolerances in order to function effectively in microelectronic devices. Doc. No. 69, Choi Aff. ¶¶5, 29.

Precision Technology Group ("PTG")[3] is a manufacturer and supplier of the Zero Width Laser Cutting Technology ("ZWLCT") systems that avoid micro cracks and chipping, leaving no residual glass particles that can damage the insides of microelectronic devices.  Doc. No. 69, Choi Aff. ¶6, Doc. No. 55-2 at 16-21, PTG Proposal #071404; Defendant's Answer to Complaint ¶19.

In July 2004, two Optowave engineers met with Nikitin and other PTG employees, including Stefan Tudor, Vice President of Sales and Marketing[4] for international sales, to discuss and evaluate the suitability of PTG's laser scribing and breaking devices for Optowave's production needs. See Doc. No. 57-2, Tudor Dep. at 15-16; Doc. No. 59-3, Nikitin Dep. at 233-34.  Tudor was Optowave's primary contact at PTG[5], and he conducted all contract negotiations with Optowave after Optowave's engineers left Florida.  *See* Doc. No. 57-2, Tudor Dep. at 15-17; Doc. No. 59-2, Nikitin Dep. at 148.

---

[1]Facts are either undisputed or read in the light most favorable to the non-moving party, as they must be on summary judgment. *See WSB-TV v. Lee,* 842 F.2d 1266, 1270 (11th Cir. 1988).  Nikitin's "undisputed" facts are either controverted by Optowave or rely on unauthenticated documents. *See, e.g.*, Doc. No. 65 (Exhibits in support of Defendant's Motion for Summary Judgment).  As Optowave points out, Nikitin did not take any depositions or conduct written discovery.

[2]An original signed copy of Mr. Choi's notarized affidavit dated July 28, 2006 was filed, following the filing of a faxed copy on July 28, 2006.  *See* Doc. Nos. 56-2, 69.

[3]Optowave sued Nikitin d/b/a Precision Technology Group ("PTG").  Doc. No. 1.  PTG contends in its counterclaim that the correct contracting entity is "Precision Technology Group, LLC."  *See infra* at 13-14.

[4]Nikitin assigned Stefan Tudor the principal responsibility for the sales relationship with Optowave.  Tudor had the direct authority to handle the Optowave account as he deemed appropriate. *See* Doc. No. 59-3, Nikitin Dep. at 226.

[5]Sometime in Spring 2005, Tudor was terminated from PTG.  Doc. No. 59-3, Nikitin Dep. at 188, 193.  All email communications between Optowave and PTG were exclusively through Tudor.  Doc. No. 59-3, Nikitin Dep. at 189-90.

On August 5, 2004, Optowave entered into a contract with PTG for the purchase of a laser scribing and breaking system, consisting of two separate machines, a glass scribing system and an automatic breaking system (the "Contract")[6]. *See* Doc. No. 55-2 & 65-2 (Contract No. 101072204P). Under the Contract, PTG was required to deliver a system consisting of two separate pieces of equipment: (1) a used SBM 777 FPD Glass Scriber (ZWCT) (the "Scribing Machine"); and (2) a new ABM 777 FPD Automatic Breaker (the "Breaking Machine"; collectively the "System"). *See* Doc. No. 55-2 & 65-2 § 1.0 (the Contract) ; Doc. No. 59-2, Nikitin Dep. at 88-89; Doc. No. 69, Choi Aff. ¶16; Doc. No. 75 at 3.

Tudor provided the original draft of the contract, which was based on a prior PTG contract that was modified by him to reflect Optowave's particular circumstances. *See* Doc. No. 57-2, Tudor Dep. at 16-17; Doc. No. 69, Choi Aff. ¶13. Tudor discussed the technical specifications (the "Contract specifications") for Optowave's product with Nikitin, who advised that they could be met. *See* Doc. No. 57-2, Tudor Dep. at 26. Nikitin relied on Tudor to conduct the contract negotiations, and Nikitin reviewed the Contract when Tudor showed it to him. Doc. No. 59-2, Nikitin Dep. at 148; Doc. No. 57-2, Tudor Dep. at 16-17.

The total purchase price of the Contract was $250,000. *See* Doc. No. 55-2 & 65-2, Contract § 1.0. Section 5.2 of the Contract specified that 90% of the total amount would be payable on notification that the shipment as specified in Paragraph 1.1 and Initial Acceptance Test (IAT) had been completed. Doc. No. 55-2 & 65-2, Contract § 5.2. The remaining 10% would be payable on successful completion of Final Acceptance Test (FAT) in Korea. "IAT and FAT forms are in attachment to the present contract and have been agreed upon by the Buyer and the Seller." Doc. No.

---

[6]During the period of contract negotiation and formation, Optowave was unrepresented by legal counsel and lacked any personnel with fluency in the English language. *See* Doc. No. 69, Choi Aff. ¶14.

55-2 & 65-2, Contract § 5.2.  The IAT and FAT forms listed specifications for eight different categories: (1) average edge roughness; (2) repeatability; (3) scribe & breaking chipping; (4) chipping after breaking; (5) linearity after breaking; (6) lateral perpendicularity after breaking; (7) cross-sectional perpendicularity after breaking; and (8) size tolerance. *See* Doc. Nos. 55-2 & 65-2 at 10-15; Doc. No. 57-2, Tudor Dep. at 26-27, 29-30; Doc. No. 69, Choi Aff. ¶¶15, 18.  Section 6.2 of the Contract stated: "For the inspected goods, the Buyer shall issue a written certificate in the form of Attachment to that effect ("Inspection Certificate") and such issuance shall constitute the Buyer's binding acceptance of the goods so inspected."  Doc. Nos. 55-2 & 65-2 at 4.  Nikitin was fully aware that the requirements were being incorporated into the Contract, having signed the Contract and initialed every page.  Doc. No. 57-2, Tudor Dep. at 27, 87-88.

The Contract also contains a "Suitability to Purpose" clause, which states:

> P.T.G. assumes no responsibility for the performance of its devices beyond serviceability, merchandisability, and adherence to specifications.  It is up to the customer to determine the machine's suitability to his needs.  Performance against published specifications and those defined by contract are guaranteed but operation of the equipment outside of these specifications is not assured.

Doc. No. 65-5 at 20.

The Contract provided for installation training of one two-day visit by an installation and training engineer "who will connect the UNIT and certify its operation"; additional on-site training would cost $1,500 per day during the week for an 8-hour day and $2,500 per day for weekend days. *See* Doc. No. 65-5 at 20 (Attachment "Standard Terms and Conditions" – Installation and Additional On-site Training sections).

In addition, the Contract also contains a provision that PTG would at its own expense repair, replace or refund the cost of the System should it fail to perform up to specifications and PTG would bear the expense of returning any defective goods. *See* Doc. No. 55-2 & 65-2, Contract, Section 3.2.

*See* Doc. Nos. 55-2 & 65-2, Contract § 3.3.  The Contract also includes a 24-month warranty which

states:

> <u>WARRANTY</u>
> The UNIT(s) shall be warranted for a period of twenty four (24) months, from the date
> of certification, to be free from defects in materials and workmanship.  P.T.G. will
> replace or repair, at its option, any component found to be defective, in normal service
> during that period.  Purchased components, software and specific devices carry their
> own warranties from their respective manufacturers and P.T.G. assumes no liability
> or responsibility for those items.  Further, P.T.G. does not warranty rubber or plastic
> parts, consumables or cutting tools.  Should safety seals on the UNIT(s) be broken or
> tampered with, the warranty will be null and void.

*See* Doc. No. 65-5 at 20 (Attachment "Standard Terms and Conditions," Warranty Section); Doc. No.

57-2, Tudor Dep. at 87-88.

Optowave agreed to obtain an irrevocable Letter of Credit ("LOC") to assure payment to PTG

for the System. *See* Doc. No. 55-2 & 65-2, Contract, § 5.2 and "Instructions to Buyer for Letter of

Credit Issuance."  The latest shipping date for the System was agreed to be September 29, 2004. *See*

Doc. No. 55-2 & 65-2, Contract, § 2.4 & "Instructions to Buyer for Letter of Credit Issuance"; Doc.

No. 57-2, Tudor Dep. at 34; Doc. No. 69, Choi Aff. ¶20.  The Contract also contained a penalty

provision for late delivery, assessing 0.3% of the total contract price for each day late, subject to a

maximum penalty of 10%. *See* Doc. No. 55-2 & 65-2, Contract, § 8.0.

On September 27, 2006, Tudor sent an email to an Optowave engineer stating:

> I am afraid I don't have good news.  Some of [PTG's] vendors informed us today that
> there will be a delay on the delivery of our parts.  This situation is really exceptional
> – our city was hit by 4 hurricanes in 6 weeks and there is a lot of destruction all
> around.  We do not have power in our factory this morning, the same as all other
> businesses in our neighborhood.  We will do our best in this situation, but I thought
> you need to know about this.

Doc. No. 65-2 at 34.

Optowave's engineer Jinyoung Kim arrived at PTG's facility in Florida on or around October

5, 2004 and was forced to wait for approximately two weeks while PTG continued to work on the

System. *See* Doc. No. 70[7], Kim Aff., ¶ 16-18; *See* Doc. No. 57-2, Tudor Dep. 51-52; *See* Doc. No. 59-3, Nikitin Dep. at 365-66.   The production and assembly of the Scribing Machine and Breaking Machine was completed on October 18, 2004.  *See* Doc. No. 69, Choi Aff. ¶33.   Initial Acceptance Testing was conducted at PTG's facility in Lake Mary, Florida, on or about October 18-19, 2004. *See* Kim Affidavit, ¶¶19, 20; *See* Doc. No. 57-2, Tudor Dep. at 42-44.

Several aspects of the System's functionality were still incomplete, and the System did not pass the Initial Acceptance Test (IAT) in Florida. *See* Kim Affidavit, ¶¶19, 20; Doc. No. 57-2, Tudor Dep. at 45; *See* Doc. No. 65-7, Letter from Nikitin dated 10/20/04.   Following discussions between the parties, they agreed to ship the System to Korea and perform the final breaking system alignment and adjustments at Optowave's facility; the agreement was memorialized in a letter from Nikitin to Optowave dated October 20, 2004, which stated:

> Currently, additional time is required to complete several aspects of the systems functionality, including refinement of the breaking parameters, file exchange protocol, staging table, alignment, and additional frame holding assemblies.
>
> As agreed upon, PTG will ship the system now, and perform the final breaking system alignment and adjustments in the actual production environment in Optowave's facility (IAT was not performed at PTG).
>
> PTG engineers, together with engineers from Optowave, will provide the additional support (outside of the originally contracted support) to do everything necessary to bring system performance to the level described in the system specifications, including the full replacement of the breaking unit.

*See* Doc. No. 65-7, October 20, 2004 Letter from Nikitin.  Optowave understood that such additional engineering support was to be provided at no extra charge. *See* Doc. No. 69, Choi Aff. ¶32; *see* Tudor Dep. at 48-49 (additional engineering support provided to Optowave at no extra charge).

---

[7]An original signed copy of Mr. Kim's notarized affidavit dated July 31, 2006 was filed, following the filing of a faxed unsigned copy on July 28, 2006.  *See* Doc. Nos. 56-2, 70.

Optowave was already badly behind schedule in preparing for a critical sales presentation to Samsung Electronics due to the delayed delivery of the System; therefore, Optowave agreed to have the System shipped to Korea to be tested in Optowave's actual production environment, subject to the statements in Nikitin's October 20, 2004 Letter. *See* Doc. No. 69, Choi Aff. ¶30.  As a condition of delivery, PTG required and Optowave agreed to release the initial 90% payment ($225,000) under the Line of Credit, subject to Nikitin's statements in the October 20, 2004 Letter. *See* Doc. No. 69, Choi Aff. ¶31.

On October 25, 2004, PTG dispatched a field engineer named Eugene Kayzerman to perform the installation of the System at Optowave's facility in Korea, as well as to assist in the final acceptance testing and to train Optowave's engineers. *See* Doc. No. 58-3, Kayzerman Dep. at 153; Doc. No. 69, Choi Aff. ¶35; Doc. No. 70, Kim Aff. ¶25.  It is undisputed that Kayzerman and Optowave engineers worked for three weeks on the System, until Kayzerman left Korea on November 13, 2004.  *See* Doc. No. 63 at 2; Doc. No. 57-2, Tudor Dep. at 53; Doc. No. 58-2 & 58-3, Kayzerman Dep. at 126, 249-50; Doc. No. 59-4, Field Service Report; Doc. No. 69, Choi Aff. ¶37.

It is also undisputed that the specifications on the test form were not met while Kayzerman was in Korea.  *See* Doc. No. 70*,* Kim Aff. ¶30; Doc. No. 57-2, Tudor Dep. at 53; Doc. No. 58-2, Kayzerman Dep. at 126.  However, Kayzerman believed that in the future the System was capable of performing the specifications.[8]  Doc. No. 58-2, Kayzerman Dep. at 126.  On November 13, 2004, the parties signed a Field Service Report.  Doc. No. 65-2 at 35-36.  The Field Service Report states in pertinent part:

**Initial installation and alignment.**

---

[8]The precise relationship between the shortcomings conceded by Kayzerman, the ultimate capabilities of the System, and the contract requirements is not entirely clear.  Due in part perhaps to language difficulties, Kayzerman's report and deposition testimony are not definitive on these points.

Equipment has arrived without visual damage and moved to clean room.  After connection to electricity, cooling water supply, and air machines were turned on, all initial test [sic] were successful.  Both SBM 777 and ABM 777 were fully functional. Next day, during the attempt to start SBM 777 computer failed.

After contacting PTG we received ghost copy of the hard drive and recovered system. In next two days have been done laser and systems alignment, initial linear scribing, and circular cutting.  After that we start to prepare to cut wafers and scribe them. During that time there were some problems with laser performance:

>    - misalignment of beam angle (beam angle has been realigned)
>    - adjustment of cut initiation tool (height, air pressure)
>    - Air-Water Jet alignment (direction of Jet, X and Y coordinates, water
>      current)

They were reason for missing scribes and circular miscutting.  Those particular subjects have to be checked on regular basis which is described in SBM 777 manual Maintenance Chart.

**Getting work conditions and performance**
Laser to breaker alignment includes calculations of first break offset, align position, fixture correction degree those factors are very important to breaker performance. After the personnel have got some initial training on machines operations I was just assisting in their process with machines operation.  To achieve the best performance of systems we tried different kind of base material, time of contact, air pressure. (All results of numerical value and pictures are at Optowave Co.)  In general we went from more than 200 micron to less than 30 micron on first break direction (90 degree).  For second direction (0 degree) is around 90 micron.
My opinion:

>    - equipment are fully functional
>    - It's capable of performing specifications needs;
>    - Needs a lot more time than we had to meet those specifications.

/S/Kim Jinyoung and /S/Eugene Kayzerman.

Doc. No. 65-2 at 35-36.

One of the Optowave engineers quit during the course of training and thereafter Kayzerman

attempted to work with the other engineers from Optowave to assist them to meet the specifications.

*See* Doc. No. 58, Kayzerman Dep. at 202-03, 257-63.  Kayzerman told Optowave that upon returning

to Florida he would work with PTG's engineers to find a solution to Optowave's problems with the

System. *See* Doc. No. 58, Kayzerman Dep. at 213-15.  It is undisputed that after Kayzerman returned

-10-

to Florida, PTG sent no other personnel for on-site assistance or training to Optowave. *See* Doc. No.

69, Choi Aff. ¶¶39-41.

On November 13, 2004, Optowave sent an email to PTG acknowledging that it did not finish

the FAT but "we would like to sign the FAT, but we worry about the claim duration.  So we would

like to extend the duration of claim."  Doc. No. 65-5 at 22 (Ex. I).  On November 17, 2004, Robert

Choo, Esq., Plaintiff's counsel, wrote to PTG complaining of the delay in the delivery of the system

and its substandard performance and advising that Optowave was withholding the remaining $25,000

until the system passed the Final Acceptance Test.  Pl. Ex. 2.[9]  On November 22, 2004, Optowave

timely submitted a warranty claim to PTG pursuant to the warranty provisions of the Contract. *See*

Pl. Ex. 4.  On November 22, 2004, PTG wrote to Mr. Choi at Optowave:

> After our field service engineer returned from Korea, we reviewed his field service
> report for information critical to understanding the situation.
>
> 1.  Based on evaluation of his trip report we believe that our equipment is in full
> compliance with paragraph #3. . . When operated by a trained operator, our equipment
> performs according to specifications in Paragraph 1, Item 1 and 2.  We also believe
> that that [sic] the performance expected by Optowave should be achieved by "fine
> tuning their manufacturing process/technology."
>
> 2.  Through our field service engineer, we have suggested to Optowave ways to check
> and verify several key parameters critical to the overall success of their
> process/technology.  These suggestions were intended to help Optowave fine-tune
> their manufacturing process.  We understand that these recommendations were not
> carried out. . . .
>
> 3.  As requested by Optowave, we shipped the system to Korea without providing
> training at our factory for two Optowave engineers, as specified in Paragraph 11
> Training of our Contract.  We understand that the only way to achieve optimum
> system performance is to have trained and certified equipment operators.  We are
> willing to schedule a formal training session at our facility in Lake Mary, Florida, as
> soon as the required equipment is available.

---

[9]References are to the exhibits presented at the Evidentiary Hearing of August 1, 2006.

> We sent one of our service engineers to Optowave's facility in Korea to provide system installation assistance and operator training. Recently we have been contacted by Optowave personnel that are trying to operate the system, but have not taken part in the training session in Korea. It is very difficult to guide untrained operators through the phone and this situation can create severe damage to the system.
>
> At Optowave's request, we are willing to send an equipment service engineer back to Korea to provide additional on-site operator training, based on a purchase order for additional field service support. . . . Please facilitate the payment for the attached Service Invoice for Installation and Training provided in Korea by our service engineer from October 23 to November 14, 2004.

Doc. No. 65-5 at 29-30. PTG provided no repair services or replacement of the System under the warranty provisions. *See* Doc. No. 69, Choi Aff. ¶41.

PTG has never furnished a replacement for the Breaking Machine or Scribing Machine to Optowave or refunded the $225,000 paid by Optowave from the Line of Credit disbursement. *See* Doc. No. 69, Choi Aff. ¶¶ 41, 43, 46. On November 18, 2004, PTG billed Optowave $68,441.28 for engineering services, which remains unpaid. Doc. No. 65-5 at 38.

Although Optowave advised PTG on several occasions in February and March 2005 of its intention to return the Breaking Machine to Florida, PTG never responded to Optowave's emails. *See* Doc. No. 69, Choi Aff. ¶46. On or about March 9, 2005, the Breaking Machine was air-freighted by Optowave from Korea to Orlando and was eventually returned back to Optowave in Korea. *See* Doc. No. 69, Choi Aff. ¶47. In an effort to cover, Plaintiff sought out comparable scribing and breaking machines, and received a quote from Schott AG, Germany – the only other manufacturer of comparable machinery in the world – of €450,000 (*i.e.,* approximately $568,084 U.S.). *Id.* at ¶42. In light of PTG's refusal to return the $225,000, Plaintiff could not afford the German machine; thus, in an effort to cover and as a stop-gap measure, Plaintiff was forced to buy four used Japanese mechanical (non-automated) breaking devices at a cost of approximately $270,882. Doc. No. 69, Choi Aff. ¶ 44. As of July 27, 2006, Optowave approximates the resale value of the used Japanese

-12-

machines at approximately $150,000.  Doc. No. 69, Choi Aff. ¶ 44. Optowave contends the manual Japanese machines are not equivalent to the automated laser system PTG promised. Choi Affidavit, ¶¶44-45, 51.  In addition to the machine costs, Optowave spent approximately $162,475 on glass mounting, expanding, and cleaning systems, to be used specifically and exclusively in conjunction with PTG's Scribing and Breaking Machines, which have been sitting idly in Optowave's facility for more than a year. Doc. No. 69, Choi Aff. ¶50.

On May 9, 2005, counsel for Optowave sent a demand letter to PTG.  Pl. Ex. 5. On July 21, 2005, Optowave filed suit in this Court alleging breach of contract and fraud in the inducement.  Doc. No. 1.  When Nikitin filed a Motion to Dismiss and to Substitute PTG Industries, LLC as the proper party on August 17, 2005, Judge Conway ordered PTG Industries, LLC to file a separate complaint, and the cases were eventually consolidated on March 9, 2006.  Doc Nos. 10, 34.

### ANALYSIS

Nikitin makes several arguments that the Court will dispose of first, before considering the cross-motions for summary judgment on the issue of whether there has been a breach of the Contract.

**Nikitin's Personal Liability--**Nikitin seeks summary judgment that Optowave has not stated a claim against Dmitri G. Nikitin d/b/a Precision Technology Group.  Optowave contends that the Contract between the parties, which forms the basis for this litigation, is between Optowave and Precision Technology Group, which is not a legally recognized entity but merely a fictitious name under which Nikitin is doing business and can not be used as a shield against personal liability.

The Court finds that the contracting party to the Contract is Nikitin doing business as the entity listed on the Contract: "Precision Technology Group" and not "Precision Technology Group

-13-

LLC" or any other limited liability company.[10]  Pursuant to Florida law, a limited liability company name must contain the words "limited liability company," or "limited company," or the abbreviations "L.L.C." or "L.C.," or the designations "LLC" or "LC" as the last words of the name of every limited liability company.  Fla. Stat. § 608.406(1)(a).  When those terms are omitted in the use of the name of the limited liability company, the persons responsible or who knowingly acquiesce in the omission are liable for any indebtedness, damage, or liability caused by the omission.   Fla. Stat. § 608.406(1)(a).

It is undisputed that the Contract was between "Precision Technology Group (PTG)" and "OptoWave Co., Ltd." and Dmitri Nikitin signed "For PTG, Precision Technology Group" as "President, CEO."  Doc. No. 65-2 at 1, 6.  The only place that an LLC entity is listed anywhere in conjunction with the Contract is in an attachment giving the instructions for the letter of credit, where PTG Industries, LLC is listed as the beneficiary of the letter of credit.  A related entity such as PTG Industries LLC can be the beneficiary of the letter of credit; it need not be the contracting party.  Nikitin also cites to other emails, communications, and invoices that he alleges clearly indicated that Optowave knew the contracting party was "PTG Industries, LLC."  However, this is parol evidence and is not admissible to vary the terms of the Contract, which is clear and unambiguous on its face.  *Florida Moss Products Co. v. City of Leesburg,* 93 Fla. 656, 660 (Fla. 1927); *Madsen, Sapp, Mena, Rodriguez & Co., P.A. v. Palm Beach Polo Holdings, Inc.*, 899 So.2d 435, 436 (Fla. 4th DCA 2005).  Nikitin is not entitled to summary judgment that Optowave has failed to sue the correct entity, PTG

---

[10]According to previous pleadings, there is no entity called "Precision Technology Group, LLC" registered in Florida.  See Doc. Nos. 14-2 and 15-2.  Judge Conway denied Nikitin's Motion to Dismiss on this basis with leave to reargue the issue on summary judgment.  Nikitin has not produced any evidence to contradict the earlier evidence that no LLC entity is registered with the State.  Under Florida law, the name of the limited liability company must be filed with the Department of State.  Fla. Stat. § 608.406(2).

Industries, LLC; therefore, it is respectfully **RECOMMENDED** that Nikitin's Motion for Summary Judgment on the entity issue be **DENIED**.

Nikitin also he contends he is entitled to summary judgment on his fees and costs for Optowave's assertion of a claim against Nikitin, rather than PTG Industries, LLC, citing Federal Rule of Civil Procedure 11[11] and Florida Statute § 57.105.  Consistent with the Court's recommendation that Nikitin is not entitled to summary judgment that Optowave has failed to sue the correct entity, Nikitin is not entitled to summary judgment for costs and fees and it is **RECOMMENDED** that the Motion be **DENIED**.

**Optowave's fraud claim--**Optowave alleges three claims for fraudulent inducement: 1) Nikitin sold Optowave a used breaking machine in violation of the Contract for a new machine; 2) Nikitin induced Optowave to enter the Contract including certain specifications even though he knew beforehand that he could not meet the specifications; and 3) Nikitin induced Optowave to accept delivery of the System in Korea and release $225,000 (90% of the full contract value) in spite of its failure to pass IAT in Florida by falsely promising that PTG would provide further support, and then refusing to do so.  Nikitin moves for summary judgment vaguely arguing that Optowave has not shown any fraud in the inducement.

The Court has already ruled that Optowave was entitled to the equivalent of an adverse inference (in the case of a bench trial, a finding of fact by the Court) that the destroyed evidence would have supported the Plaintiff's case on the following two issues: 1) the parties understood that acceptance tests, or the contract specifications, were incorporated into the Contract, and 2) the Contract must be construed against PTG, who drafted the Contract.  *See* Doc. No. 90 at 20-21.  One

---

[11]Nikitin appears not to have followed the procedure set forth in Rule 11 affording the non-moving party notice and a safe harbor of 21 days to withdraw its claim, or in seeking sanctions via a separate motion.

of the specifications was for the System to meet perpendicularity of +/- 5 microns for linear and cross-sectional perpendicularity.  Doc. No. 55-2 & 65-2 at 10-15.  Nikitin has admitted that the System was only designed to repeat its scribing and breaking lines to a tolerance of +/- 30 microns. Doc. No. 59-3, Nikitin Dep. at 430-435.  Optowave contends that Nikitin knew the System was inherently incapable of meeting the Contract's specifications when he signed the Contract.  At the very least, there is a material fact issue on Optowave's fraudulent inducement claim regarding the Contract specifications.

Optowave's fraudulent inducement claim is also based on the parties' agreement memorialized in a letter from Nikitin to Optowave which promised that "PTG will ship the system now, and perform the final breaking system alignment and adjustments" in Korea, and "PTG engineers, together with engineers from Optowave, will provide the additional support (outside of the originally contracted support) to do everything necessary to bring system performance to the level described in the system specifications, including the full replacement of the breaking unit." *See* Doc. No. 65-7, October 20, 2004 Letter from Nikitin.  Optowave and PTG's salesman, Tudor, understood the agreement to provide additional engineering support at no extra charge.  *See* Doc. No. 69, Choi Aff. ¶32; *see* Tudor Dep. at 48-49.  Nikitin does not dispute that he has billed Optowave for the engineering services of Kayzerman for approximately $68,000.  Material factual issues remain and Nikitin is not entitled to summary judgment on Optowave's fraudulent inducement claims; therefore it is respectfully **RECOMMENDED** that the Motion for Summary Judgment on this issue be **DENIED**.

**Claims for lost profits--**Nikitin contends that he is entitled to summary judgment denying Optowave's claims for lost profits based on the language of the "Suitability to Purpose" and "Warranty" clauses and other language limiting his liability under the Standard Terms and

Conditions.  Nikitin also argues that he is entitled to summary judgment because Optowave's lost profits are highly speculative since Optowave was a start up company.

The contract language relied on by Nikitin sets forth some aspects of the contract specifications and the extent of the warranty but does not limit the remedies available to Optowave, if a breach is proved.  *Cf.,* Fla. Stat. § 672.719.

As to the issue of proof of damages, Optowave points to the testimony of Tudor from PTG that he knew that Optowave had a business relationship with Samsung and that the System was to be used by Optowave to manufacture infrared filters for sale to Samsung. See Doc. No. 57-2, Tudor Dep. at 16-18; see also Doc. No. 84-2, Ex. B (emails between Tudor and Optowave from August 2004 to October 2004 with references to Optowave's business relationship with Samsung).  Nikitin has also admitted that he was aware that Optowave was selling its products to Samsung. See Doc. No. 84-2, Nikitin March 3, 2006 Affidavit, ¶¶ 74 and 76, Ex. A.

Optowave contends that it has produced copies of purchase orders and invoices documenting Optowave's reduced sales to Samsung and lower sales profits because it was forced to purchase lower quality glass cutting machines with significantly lower production capacity. See Doc. No. 84-3, Exhibit C.  Optowave has also submitted an expert report from a certified public accountant, Ye Chi Soo, detailing the reduced production capacity and lost sales resulting from Optowave's use of manual glass cutting machines, along with an estimate of lost monthly profits about which Mr. Soo will testify at trial. See Doc. No. 84-3, Exhibit D.  It is respectfully **RECOMMENDED** that Nikitin's Motion for Summary Judgment on this point be **DENIED**.

**Cross-Motions for Summary Judgment on Breach of Contract--**Optowave moves for partial summary judgment that Nikitin breached the Contract because the System failed to meet the Contract specifications and Nikitin failed to repair, replace or refund the cost of the System.  Nikitin

argues that he is entitled to summary judgment that he has not breached the Contract because the System met the Contract specifications, but did not work properly because Optowave's engineers could not properly operate such sophisticated equipment.  Nikitin also argues that he is entitled to summary judgment because Optowave breached a duty to sign the FAT form and did not make final payment.  Optowave responds that since the FAT was never passed, Optowave was never obligated to release the final payment.

*Contract's Specifications*--Previously, the Court ruled that Optowave was entitled to an adverse inference that the destroyed evidence would have supported the Plaintiff's case on the following two issues: 1) the parties understood that acceptance tests, or the contract specifications, were incorporated into the Contract, and 2) the Contract must be construed against PTG, who drafted the Contract.  *See* Doc. No. 90 at 20-21.  Therefore, the Court need only determine whether Optowave is entitled to summary judgment on the issue of whether Nikitin has failed to meet the Contract specifications and, thus, breached the Contract.  If so, then Optowave had no duty to pay Nikitin for the final installment.

As Optowave points out, Nikitin had no personal knowledge of whether the System met the acceptance test parameters at Optowave's facility in Korea, or PTG's facility in Lake Mary, Florida because he was not present when the System was tested. Doc. No. 59-2, Nikitin Dep. at 164. Optowave contends that Nikitin's October 20, 2004 letter concedes that the System did not pass the IAT in Florida, owing to various problems with "systems functionality that were not completed." Doc. No. 65-7, October 20, 2004 Letter from Nikitin.  Tudor also confirmed that Optowave's acceptance test specifications were never met in Florida, prior to the shipment of the System to Korea. Doc. No.57-2, Tudor Dep. at 45.

It is established that the Contract included provisions that the System meet the requirements of the IAT and FAT.  It is clear that the System was never shown to meet those requirements. However, the nature of the System (sophisticated equipment contemplating well-trained operators) creates issues in defining and establishing proper performance.  The parties' course of performance and the ambiguities in Kayzerman's descriptions of events[12] leave unresolved issues as to whether in fact the System conformed to the contract requirements as well as the extent to which some of those requirements may have been waived by Optowave.  There are also disputes as to the quality of Optowave's own operators and whether Nikitin provided the training contemplated under the contract.

Nikitin contends that the System was fully functional, but that it did not pass the FAT because Optowave's engineers were incompetent to operate the machinery.  Kayzerman testified that one of the Optowave engineers quit during the course of training and thereafter he attempted to work with the other engineers from Optowave to assist them to meet their product specifications. *See* Doc. No. 58, Kayzerman Dep. at 202-03, 257-63.  The Field Service Report stated that, "After the personnel have got some initial training on machines operations I was just assisting in their process with machines operation."  Doc. No. 59-4, Field Service Report.

Kayzerman reported with regard to the testing: "In general we went from more than 200 micron to less than 30 micron on first break direction (90 degree).  For second direction (0 degree) is around 90 micron."  His opinion was: "the equipment are fully functional; the System is capable of performing specifications needs; and Needs a lot more time than we had to meet those specifications."  Doc. No. 59-4, Field Service Report.

---

[12]Kayzerman's contemporaneous field report and litigation deposition both suffer from his weaknesses with the English language.  As to the crucial legal conclusions, his accounts are frustratingly imprecise and ambiguous.

-19-

Kayzerman testified that he did not personally test the machines to see if they could conform to the specifications because it was not his area of expertise and he did not know how to do that; he testified that to test the specifications required special education or knowledge.  Doc. No. 58-2, Kayzerman Dep. at 116.  He testified that in Florida he tested the machines prior to shipment and cut the glass; the machine could cut any glass.    Doc. No. 58-2, Kayzerman Dep. at 118.  Optowave asked Kayzerman to use the machines so that the glass would be cut according to the specifications, but he did not do the testing.  Doc. No. 58-2, Kayzerman Dep. at 118-19.  He also testified that the specifications on the test form were not met while he was still in Korea.  Doc. No. 58-2, Kayzerman Dep. at 126.

When he said in the Field Service Report that the equipment "fully functions" and met "system specifications," he was referring to the "specifications" that are in the PTG fliers and other general PTG literature that are usually in PTG contracts.  Doc. No. 58-2, Kayzerman Dep. at 124-25.  Kayzerman had not read the Contract with Optowave (*id.* at 124) and therefore, was not aware of any changes to what he regarded as the  typical PTG contract specifications:

> Q. When you say "the equipment are fully functional," how does that reconcile with the final bullet there, "needs a lot more time than we had to meet those specifications"?
> A. It's – that's probably my bad English.  I'm not – it's not my native language.  But what I meant from that, is that I meant Optowave needs to learn how to do that.  I mean, they need more time to achieve their goal.
> Q. So the specifications you're referring to there are Optowave's needs –
> A. Right, absolutely.
> Q. – not the system specifications that you referred to a minute ago –
> A. No.
> Q. – that are in the [PTG] flier?  What you assume are in the contract?
> A. Right.
> Q. Let me take you one bullet up there, "it's capable of performing specifications needs."
> A. That's OptoWave specifications.
> Q. And you're saying in that same paragraph – go ahead, right.
> A. These two last is for that what you are showing me before.  This is requirements that's according to that (indicates).  So it says – okay.  That's it.

* * *

Q. Okay. In the above paragraph where you state that: We went from more than 200 micron to less than 30 micron on first break direction; for second direction is around 90 micron –

A. Right.

Q. Those are the results – you're certifying that those are the results that were achieved during the time you were there –

A. Right.

Q. – with respect to which parameter?

A. Breaking. Oh, breaking. That's after breaking.

Q. Okay. Is it fair to say that the parameter specifications in this test form (indicates) were not achieved while you were there?

A. Yes.

Q. But you're stating that you believe that in the future it was capable of performing those specifications?

A. Absolutely. Absolutely.

Q. During the time that OptoWave was trying to get the machines to produce glass filter output that met their needs, what kind of things were they asking you to do?

A. Just to be there. Just to help them, assist them. Because, you know, usually they have questions with these machines themself. Just to, you know, freshen them up on operation.

Because it's complicated systems. It's not – you know, even if you learn to drive a car, you don't just sit in the car and drive; right? You need some – to get used to. Same thing. It's more complicated. It needs to be a special training person.

Q. So what kind of questions or assistance would they ask you to perform?

A. Assistance like alignment procedure. It's pretty complicated also. You know, and I was watching them to work with those, and I was correcting them on the fly when they were doing some performance operations with these machines.

Alignment, as I said – now that you refresh my memory on this letter – it's alignment between laser and breaker. It's very important. And most of them, they didn't even have those special forms for the glass at the time I was there.

Q. What do you mean by "forms"?

A. Remember you are asking, is it science to put a glass on the table? Yes, there is a science to put the glass on the table. So it's special forms you have to use to put this glass on the table. And they didn't have it at the time. They are – were getting them, I believe, after I left.

And they were using ours, what we sent with the machine, which were not meant to be used with precision technology. Just – you know, it's just rough forms which were made on our equipment just to – and they were using them.

So that's what that means. That mean that they need to get everything what they wanted to have and they will probably achieve it much faster than they were trying to do at beginning.

So that's what – that's what my job was there, to assist them, to teach them to – you know, how to operate the system.

Q. But you resisted actually performing the glass breaking test themselves?

A. Yes. Because that's not what I do.

-21-

Doc. No. 58-2, Kayzerman Dep. at 125-28.

Taking these ambiguities together, it is not appropriate to determine under Rule 56 standards whether there was a breach of the contract, and, if so, what damages may be recoverable.

It is therefore respectfully **RECOMMENDED** that the motions be **DENIED** to the extent they seek summary judgment on the issue of breach of contract, subject to the specific findings set forth above.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**RECOMMENDED** in Orlando, Florida on December 6, 2006.

*David A. Baker*
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record