**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**OPTOWAVE CO., LTD,**

        **Plaintiff,**

**-vs-**                                                      **Case No. 6:05-cv-1083-Orl-22DAB**

**DMITRI G. NIKITIN, an individual, d/b/a**
**PRECISION TECHNOLOGY GROUP,**

        **Defendant.**

_____

**ORDER**

**I. INTRODUCTION**

This cause comes before the Court for consideration of Plaintiff/Cross-Defendant's, Optowave Co., LTD, Motion for Partial Summary Judgment (Doc. 55), filed July 28, 2006, to which Defendant, Dmitri G. Nikitin has responded (Doc. 76), and Counter-Plaintiff's, PTG Industries, LLC, Motion for Summary Judgment (Doc. 63), filed July 28, 2006, to which Counter-Defendant, Optowave Co., LTD, has responded (Doc. 84). United States Magistrate Judge David A. Baker issued a Report and Recommendation (Doc. 97) on December 6, 2006 on both of the motions for summary judgment. In his memorandum opinion, Judge Baker recommended that both Optowave's Motion for Summary Judgment and PTG Industries' Motion for Summary Judgment be denied. Nikitin filed Objections (Doc. 99) to Judge Baker's ruling on December 15, 2006. Optowave has not responded, and the time for doing so has expired. Optowave has, however, filed a Motion to Reconsider (Doc. 100) to Judge Baker's Report and Recommendation on December 17, 2006, to which

Defendant did not respond. Having reviewed the Report and Recommendation and the Defendant's Objections thereto, this Court **OVERRULES** the Defendant's Objections, **DENIES** Plaintiff's Motion to Reconsider, and **AFFIRMS** and **ADOPTS** Judge Baker's well-reasoned memorandum opinion.

## II.  BACKGROUND

Optowave, a Korean company, is a startup corporation specializing in thin film optic technology. Doc. 69 at 4. Optowave's primary business is the manufacture and sale of sophisticated high quality infrared filters, which are used in microelectronic products like cell phone cameras. *Id.* The filters must be precise to fit extremely tight tolerances demanded by large Korean cellular phone manufacturers. *Id.*

Precision Technology Group (PTG) manufactures Zero Width Laser Cutting Technology (ZWLCT) systems, which do not leave any micro cracks, chips, or residual glass particles that damage the insides of microelectronic devices. *Id.* at 5; Doc. 55-2 at 16-21. Dmitri Nikitin is the President of PTG. Doc. 59-2 at 6.

In July 2004, two engineers from Optowave met with Nikitin and other PTG employees, including Stefan Tudor, the Vice President of Sales and Marketing for international sales.[1] The parties discussed whether PTG's laser scribing and breaking machines would be suitable for Optowave's production needs. Once Optowave's representatives left Florida, Tudor, PTG's main contact for Optowave, conducted all contract negotiations with Optowave. *See* Doc. 57-2 at 5; Doc. 59-2 at 38.

---

[1] Nikitin appointed Stefan Tudor to represent PTG in all its dealings with Optowave. Doc. 59-3 at 226.

On August 5, 2004, Optowave entered into a contract with PTG to purchase a laser glass scribing machine and an automatic breaking machine (Contract). Doc. 55-2 at 1-15 (Contract # 101072204P). The Contract required PTG to deliver a system consisting of two separate pieces of equipment: (1) a SBM 777 FPD Glass Scribing System (ZWCT) (Scribing Machine); and (2) a ABM 777 FPD Automatic Breaker (Breaking Machine; the two machines collectively the System). Doc. 55-2 at 1-3.

PTG, through Tudor, provided the initial draft of the contract, which PTG based on prior contracts it had on file. Doc. 57-2 at 5. Nikitin told Tudor that PTG could meet the specifications required by the Contract. *Id.* at 8. Tudor conducted the contract negotiations, which Nikitin reviewed and approved. Doc. 59-2 at 38. Nikitin, in addition to signing the Contract, initialed every page. Doc. 55-2 at 1-15.

The parties settled on a purchase price of $250,000. Doc. 55-2 at 4. The first 90% of the purchase price was to be paid when Optowave received notification that the System had been shipped to Optowave's facility in Korea and the Initial Acceptance Test (IAT) had been completed as specified in the Contract. *Id.* The remaining 10% would be paid on a successful completion of the Final Acceptance Test (FAT) in Korea. *Id.* Both the IAT and the FAT listed specifications in eight categories: (1) average edge roughness, (2) repeatability, (3) scribe & breaking chipping, (4) chipping after breaking, (5) linearity after breaking, (6) Lateral perpendicularity after breaking, (7) cross-sectional perpendicularity after breaking; (8) size tolerance. Doc. 55-2 at 10-14. These sections comprised the Inspection Certificate. *Id.* at 10. In accordance with the Contract, the Optowave had to

issue an Inspection Certificate, which would constitute the Optowave's binding acceptance of the System. *Id.* at 4.

The Contract provided that Optowave would conduct the IAT of the System at PTG's offices in Florida prior to the System's shipment to Korea. *Id.* at 4. The Contract additionally stated that PTG would send an installation and training engineer to Korea for a two day visit to connect the System and certify its operation; should PTG's engineer be required to stay on-site for more than two days it would cost Optowave $1,500 per day during the week and $2,500 per day on the weekend. *Id.* at 7. Furthermore, the Contract provided that PTG would repair, replace, or refund the cost of the System should it not perform to the specifications; PTG would bear the cost of returning any defective goods. *Id.* at 3. The Contract also provided a 24 month warranty:

### WARRANTY

The UNIT(s) shall be warranted for a period of twenty four (24) months, from the date of certification, to be free from defects in materials and workmanship. P.T.G. will replace or repair, at its option, any component found to be defective, in normal service during that period. Purchased components, software and specific devices carry their own warranties from their respective manufacturers and P.T.G. assumes no liability or responsibility for those items. Further, P.T.G. does not warranty rubber or plastic parts, consumables or cutting tools. Should safety seals on the UNIT(s) be broke or tampered with, the warranty will be null and void.

*Id.* at 6. Additionally, the Contract explicitly stated "[p]erformance against published specifications and those defined by contract are guaranteed but operation of the equipment outside of these specifications is not assured." Doc. 55-2 at 7.

Pursuant to the Contract, Optowave obtained an irrevocable Letter of Credit (LOC) to assure payment to PTG for the System. *Id.* at 4. The System had to be shipped to Korea

by September 29, 2004. *Id.* at 3; Doc. 69 at 6. If the System was not delivered by that date then the contract provided a penalty assessing 0.3% of the total purchase price against the seller for every day late; the maximum penalty was 10%. Doc. 55-2 at 4.

On September 27, 2006, Tudor emailed Jinyoung Kim, an Optowave engineer, the following:

> I am afraid I don't have good news. Some of [PTG's] vendors informed us today that there will be a delay on the delivery of our parts. This situation is really exceptional – our city was hit by 4 hurricanes in 6 weeks and there is a lot of destruction all around. We do not have power in our factory this morning, the same as all other businesses in our neighborhood. We will do our best in this situation, but I thought you need to know about this.

Doc. 65-2 at 34.

Mr. Kim went to PTG's facility in Florida on or around October 5, 2004 to inspect the System. However, he was forced to wait an additional two weeks for PTG to finish working on the System. Doc. 70 at 6. On October 18, 2004, Mr. Kim was told that the System was finally completed and ready for the IAT. *Id.* On October 18 and 19, 2004, the IAT was conducted and the System failed to meet the specifications. *Id.*; Doc. 57-2 at 12.

At this point, Optowave was desperate to have the System up and working in its plant in Korea. *See* Doc. 69 at 7. Optowave had an important sales meeting with Samsung. *Id.* The parties agreed to ship the System to Korea and finish fine-tuning the System there; Nikitin memorialized this agreement in a letter to Optowave on October 20, 2004:

> As agreed upon, PTG will ship the system now, and perform the final breaking system alignment and adjustments in the actual production environment in Optowave's facility (IAT was not performed at PTG).
>
> PTG engineers, together with engineers from Optowave, will provide the additional support (outside of the originally contracted support) to do

> everything necessary to bring system performance to the level described in
> the system specifications, including the full replacement of the breaking unit.

Doc. 65-7 at 11. Optowave believed that the additional engineering support provided by PTG referred to in the letter was to be provided without charge to Optowave. Doc. 69 at 8; Doc. 57-2 at 48-49. When the System was shipped to Korea, Optowave agreed to release the initial 90% payment ($225,000) pursuant to the Letter of Credit. *Id.*

On October 25, 2004, PTG sent Eugene Kayzerman, a field engineer, to install the System in Optowave's facility in Korea, to assist in running the FAT, and to train Optowave's engineers. *Id.*; Doc. 58-3 at 3. Neither party disputes that Kayzerman worked with Optowave engineers for three weeks on the System until Kayzerman left for Florida on November 13, 2004. Additionally, the parties do not dispute that the specifications required by the Contract were not met while he was in Korea. Doc. 58-2 at 33; Doc. 70 at 7. Kayzerman believed that the System was capable of performing the specifications at some future point. Doc. 58-2 at 126-27.

Kayzerman informed Optowave that he would further work with PTG's engineers to fix the System when he returned to Florida. Doc. 58-3 at 213-15. After Kayzerman returned to Florida PTG did not send any other personnel to Korea for further training or assistance.

On November 17, 2004 Robert Choo, Plaintiff's counsel, informed PTG that due to the delay in delivery of the System and its inadequate performance that Optowave was withholding the remaining $25,000 due on the Contract until the System passed the FAT. Doc. 66-2 at 1. On November 22, 2004, Optowave submitted a warranty claim to PTG that

was both pursuant to the Contract and timely. *Id.* PTG did not provide repair service or replacement of the System under the Contract provisions. Doc. 69 at 9. PTG also did not refund the $225,000 paid by Optowave pursuant to the Letter of Credit disbursement. *Id.* PTG did, however, bill Optowave $68,441.28 for engineering services, which Optowave has not paid. Doc. 65-5 at 38.

Attempting to cover, Optowave sought out comparable scribing and breaking machines. It received a quote from Schott AG,[2] Germany for 450,000 Euros (nearly $600,000). Doc. 69 at 9. Optowave could not afford that outlay after already spending $225,000 on the PTG System; therefore, Optowave had no other choice but to buy four used Japanese mechanical, non-automated, breaking machines for $270,882. *Id.* Optowave estimates that the resale value of the Japanese machines are approximately $150,000. *Id.* Furthermore, Optowave argues that the manual Japanese machines are not the equivalent of the automated laser system PTG promised. *Id.* at 9-10. Optowave has additionally spent $162,475 on various equipment and material purchased specifically and exclusively for use with the PTG System. *Id.* at 10.

Optowave brought an action in this Court against Nikitin d/b/a Precision Technology Group for breach of contract evolving from these dealings with Nikitin and PTG. Judge Baker had previously found an adverse inference against Nikitin that the parties had expressly incorporated into the Contract narrow tolerance specifications and testing requirements. Optowave's position is that the Court should grant it summary judgment

---

[2]Schott was the only other manufacturer of comparable machinery in the world. Doc. 69 at 9.

because the PTG machines failed to meet the Contract specifications and PTG did not repair, replace, or refund the cost of the machines. Optowave additionally seeks summary judgment on PTG's countersuit.

Nikitin d/b/a PTG contends that the Court should grant summary judgment to him because Optowave sued the wrong PTG entity, that Optowave accepted the machines as meeting all the contract specifications, and that Optowave did not pay the remainder of the contract price or the additional engineering services provided by PTG.

The magistrate judge came to the following conclusions. Regarding Nikitin's personal liability, Nikitin was not entitled to summary judgment for the entity issue or the costs and fees associated with it. Regarding Optowave's fraud claims, Nikitin was not entitled to Summary Judgment because material factual issues remain. Regarding Optowave's claims for lost profits, Nikitin was not entitled to summary judgment. Regarding Optowave's cross-motions for summary judgment on the breach of contract issue, there were too many ambiguities to determine pursuant Rule 56 whether there was a breach of contract and, if so, what damages would be recoverable.

### III. ASSIGNMENTS OF ERROR

In his Objections (Doc. 99) to Judge Baker's Report and Recommendation (Doc. 97), Nikitin assigns multiple points of error. First, he argues that the proper party to the Contract is PTG, Industries, LLC. Doc. 99 at 1. Second, Nikitin contends that the part of the System that is in contention in the instant suit is the Breaking machine, the price of which is $100,000. *Id.* Third, he argues that the latest shipping date was renegotiated to October 31, 2004, instead of September 29, 2004. *Id.* Fourth, he claims that the magistrate

judge overlooked the force majeur clause in the contract, which excuses performance by Nikitin for acts of God. *Id.* at 2. Nikitin submits that the four hurricanes fall into this category. *Id.* Fifth, Nikitin and PTG contend that Optowave knew that the extra engineering support was to be provided at a charge, not for free. *Id.* Sixth, Nikitin claims emails from Tudor and Optowave prove that the equipment is in substantial compliance with the specifications. Seventh, Nikitin argues that the reason PTG did not send additional personnel to Korea was due to Optowave's nonpayment of Kayzerman's trip to Optowave's facilities. *Id.* Eighth, Nikitin claims that Optowave has not returned the scribing machine and that the scribing machine is not in litigation and therefore the claim should be limited to the 90% cost paid of the breaking machine, which is $90,000. *Id.* at 3. Ninth, Nikitin argues that the fraud claim should be dismissed. *Id.* Tenth, Nikitin argues that the magistrate judge erred in his analysis for the claims for lost profits and that claim should be dismissed. *Id.* at 5.

Optowave did not file an objection, instead it filed a motion for reconsideration on the issue of the breach of contract.

### IV. STANDARD OF REVIEW

When a magistrate judge issues a report and recommendation, the district judge must make a *de novo* determination of the findings and/or recommendations to which any party objects. *See* 28 U.S.C. § 636(b)(1)(C) (2003). "This requires that the district judge 'give fresh consideration to those issues to which specific objection has been made by a party.'" *Lacy v. Apfel*, 2000 U.S. Dist. Lexis 21437, *2-3 (M.D. Fla. Oct. 20, 2000) (quoting *Jeffrey S. v. State Bd. of Educ.*, 896 F. 2d 507, 512 (11th Cir. 1990)). "In the absence of specific

objections, there is no requirement that a district judge review factual findings *de novo*." *Id.* at 3 (emphasis added) (internal citation omitted).  However, regardless of whether objections are filed, a district judge must review a magistrate's legal conclusions *de novo*. *See id.*  After reviewing a report and recommendation, objections, and responses thereto, the district judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. *See* § 636(b)(1)(C).

## IV.  ANALYSIS

### A.  Nikitin's Objections

As Nikitin's first assignment of error, he claims that the magistrate judge erred in denying Nikitin's motion for summary judgment on the issue of his personal liability on the Contract.  Nikitin argues that the proper party to this action is PTG Industries, LLC, not Nikitin d/b/a PTG Industries.  Nikitin does not contest that the Contract states that it is between "Precision Technology Group (PTG)" and "Optowave Co., Ltd." and that Nikitin signed "For PTG, Precision Technology Group" as President, CEO." Doc. 55-2 at 6.

Instead, Nikitin makes various other arguments.  Doc. 99 at 3-4.  Nikitin claims that PTG Industries, LLC has been properly registered with the State of Florida.  Nikitin also claims that the magistrate judge overlooked the initial quotes PTG Industries, LLC gave to Optowave, which demonstrates that Nikitin was not the proper party.  Additionally, Nikitin points to Tudor's deposition in which he stated that he was employed by PTG Industries, LLC, not by Nikitin d/b/a Precision Technology Group.  Nikitin additionally states that the evidence he is asserting does not violate the parol evidence rule because the Contract itself

is not clear and unambiguous on its face. Nikitin contends that the Contract is unclear because Tudor drafted the Contract and his native language is Russian, not English.

The law in Florida regarding the name of a Limited Liability Company is Florida Statute 608.406(1)(a), which states in pertinent part:

> Omission of the words "limited liability company" or "limited company," the abbreviations "L.L.C." or "LC" in the use of the name of the limited liability company shall render any person who knowingly participates in the omission, or knowingly acquiesces in the omission, liable for any indebtedness, damage, or liability caused by the omission.

§ 608.406(1)(a). Nikitin does not contend that the Contract stated, in any of the above forms, that PTG was a limited liability company. The fact that PTG was incorporated as an LLC at the time the Contract was consummated is besides the point if Optowave did not know this when it signed the Contract. Nikitin argues that the parol evidence rule does not apply because the contract was ambiguous because his employee, who drafted the Contract,[3] was not a native English speaker. In effect, Nikitin would have the Court give him an out due to incompetence in drafting the Contract on his behalf. Optowave contends that it contracted with Nikitin, not PTG Industries, LLC. The Contract clearly demonstrates Optowave's contention. The Court declines to read ambiguity into a Contract that is clear and unambiguous on its face. Nikitin's Motion for Summary Judgment on the entity issue is **DENIED**.

Next, Nikitin makes several statements that do not directly relate to the findings of the Report and Recommendation. Nikitin states that the appropriate price for the breaking

---

[3] Tudor did not even write the majority of the Contract, instead Nikitin gave him old contracts that PTG had used in other deals. Doc. 57-2 at 6.

machine is $100,000 and that since Optowave kept the scribing machine then it and its price should not be included in damages.  Nikitin also states that the parties reestablished the latest shipping date to October 31, 2004 and therefore Nikitin does not owe Optowave a penalty for failing to delivery the System on time.  Nikitin notes that the report and recommendation overlooked the force majeur clause in the Contract.  Nikitin argues that this clause excuses performance of the Contract by Nikitin due to the hurricanes.[4]  Additionally, Nikitin disputes Optowave's position that it believed that it did not have to pay for Kayzerman's trip to work on the System in Korea.[5]  In another objection, Nikitin asserts that new evidence attached to his Objections demonstrates that the System is in compliance with the Contract specifications.  Even with this evidence there still remains a question of material fact.[6]  Although these arguments are relevant to the case they are not necessary relevant to Judge Baker's findings.  The Court acknowledges that it has the discretion to review and rule on the new arguments introduced by Nikitin's objections; *Stephens v. Tolbert*, ---F.3d---, 2006 3488978 (11th Cir. 2006); however, the Court declines to do so at

---

[4] Nikitin's argument is unclear on this point.  The Court cannot tell if he is stating that the whole Contract should be nullified or only if Nikitin should not have been fined for shipping the System later than agreed upon in the Contract.

[5] Since Judge Baker recommended to deny summary judgment for both parties this argument is irrelevant.

[6] The Court notes that this evidence, consisting of twenty-two pages of emails between the parties regarding the performance of the System in Optowave's facility, is at best counter-productive for Nikitin.  The emails do not demonstrate that the System was in substantial compliance as Nikitin argues but instead that Optowave believed that the System failed to meet the Contract specifications.

this junction. The Court finds it more appropriate to rule on Nikitin's arguments at the trial.

**B. Optowave's Motion for Reconsideration**

Optowave did not file any objections to the report and recommendation; instead, it filed a motion for reconsideration of Judge Baker's recommendation not to grant Optowave's partial summary judgment motion with respect to the breach of contract claim (Doc. 100). Optowave suggested that instead of relying on Kayzerman's ambiguous testimony, the Court only needs to look to Judge Baker's finding that Nikitin admitted that the System was only capable of a tolerance of +/- 30 microns. Doc. 97 at 16. Optowave contends that this tolerance could not pass the requisite +/- 5 micron standard in the Contract specifications.

Moreover, the magistrate judge previously found, in an order regarding a discovery violation, that Optowave was entitled to an adverse inference that "1) the parties understood that acceptance tests, or the contract specifications, were incorporated into the Contract, and 2) the Contract must be construed against PTG, who drafted the Contract." Doc. 90 at 20-21.

Even taking Nikitin's statement that the System did not meet the Contract specifications there is still a question of material fact. The parties deviated from the Contract. Optowave agreed to have the System delivered to its facility even though it did not pass the IAT at PTG's facility in Florida. It appears that both Optowave's engineer Jinyoung Kim and Eugen Kayzerman agreed that the System was fully functional and that it was capable of performing specifications. Doc. 55-2 at 25. Additionally, Nikitin argues that

the System was fully functional but failed the FAT because of the incompetence of Optowave's engineers. Therefore, the breach of contract issue does not meet the Rule 56 summary judgment standard. The issue to be tried on this claim is whether the System meets the Contract specifications or not.

## V. CONCLUSION

Based on the foregoing, it is **ORDERED** that:

1. The Defendant's, Dmitri G. Nikitin, December 13, 2006 Objections (Doc. 99) to United States Magistrate Judge David A. Baker's December 6, 2006 Report and Recommendation (Doc. 97) are **OVERRULED**.

2. The Plaintiff/Counter-Defendant's, Optowave Co., LTD, Motion to Reconsider Judge Baker's Report and Recommendation (Doc. 100), filed on December 17, 2006, is **DENIED**.

3. United States Magistrate Judge David A. Baker's December 6, 2006 Report and Recommendation (Doc. 97) is **APPROVED AND ADOPTED.**

   (a) Plaintiff/Cross-Defendant's, Optowave Co., LTD, Motion for Partial Summary Judgment (Doc. 55), filed July 28, 2006, is **DENIED.**

   (b) Defendant's, Dmitri G. Nikitin, and Counter-Plaintiff's, PTG Industries, LLC, Motion for Summary Judgment (Doc. 63), filed July 28, 2006, is **DENIED**.

4. This case remains scheduled for a two day trial with a date certain of January 18, 2006 at 9:30 am Courtroom #2 of the George C. Young U.S. Courthouse.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on January 13, 2007.

_____
ANNE C. CONWAY
United States District Judge

Copies furnished to:
Counsel of Record
Judge David A. Baker